Good afternoon. Good afternoon, Your Honor. May I please the court? David Comerford on behalf of Deloitte and Touche. If I could, Your Honor, I would like to reserve 12 minutes. Fine. Thank you. We're here today for three reasons. Number one, the District Court applied the wrong standard for market efficiency. Number two, the District Court ignored evidence that regardless of whether the market was efficient, these plaintiffs themselves did not rely on the integrity of the market. And number three, the District Court failed to conduct any analysis of loss causation for applying the fraud on the market presumption of reliance. On number two, I gather your argument is because the claims were based on trading in an inefficient or a market that was, did not reflect the accurate value that therefore the plaintiffs are, simply can't approve an efficient market in this case. Is that correct? Well, number two, that is correct, Your Honor. With respect to market efficiency, we do show or we do argue that the statements by plaintiffs themselves that the markets were not efficient and that they were looking for an informational advantage within the markets in which DVI traded shows that the market was not efficient. That is correct. But also, a corollary to that, Your Honor, is even if the court were to affirm that the market was efficient, these plaintiffs, there is evidence in the record that these plaintiffs were trading in securities that they believed were incorrectly priced. They were not relying on the integrity of the market. So, and Judge Davis did not address that issue. I understand that. Isn't there, and maybe we'll come back to your first question, do you want to explore that as well? Are we talking about informational efficiency or fundamental value efficiency? I mean, you've seen, you know, the First Circuit, Judge Lopez's analysis here. Right. Do you buy into that analysis, that there is a difference between the types of efficiency one should be analyzing at the Rule 23 stage of class certification? Well, I think with respect to whether or not the market was efficient, the issue is informational efficiency, whether or not it was efficient. But with respect to the second issue that I point to, which is these plaintiffs and whether they were relying on the integrity of the market, it doesn't matter whether they thought there was informational efficiency and value. Let me ask you on that. Let's assume you're right. These lead plaintiffs may have been trading for other reasons. But does that make them inadequate to represent a class that would not be trading for those other reasons? Well, the issue... Do they still not? Typicality? Well, no. Actually, Your Honor, the question really goes to the reliance prong. If the fraud on the market presumption can apply to investors who trade on securities based on their belief that the market price is inaccurate. So it doesn't necessarily go actually to typicality. It goes to the reliance prong, which we are entitled to rebut. I guess just maybe in my naive way, I'm thinking what you're saying is that these lead plaintiffs weren't typical of the ordinary people in the class. No. Actually, it is a rebuttal to the argument. Again, I'm making this argument with respect to what these plaintiffs did in the event that the court were to affirm that there is an efficient market. I then have the opportunity and, in fact, we believe did rebut that presumption with respect to these plaintiffs and, therefore, we have rebutted reliance with respect to the plaintiffs. This is an issue that Judge Davis didn't even consider. And a sub-issue is whether you can do it at the class certification stage or whether you have to wait until later to do that. Yeah, we believe... Exactly. We believe that it should be done at the class certification stage. It should be a rigorous analysis of all the elements necessary for a 23 certification. Let me... Go ahead. Just sort of to lay out a big picture. It almost seems to me, when you first look at this from 10,000 feet, I guess, that you're asking us the, quote, rigorous analysis, and this is sort of maybe the next case after hydrogen peroxide, which my buddy over here wrote, how far do you dig into the merits? Yes, you have to dig into the merits somewhat, but do you go as far as you're suggesting? And as I read hydrogen peroxide, and we can talk to the author here, but I don't think you go in quite the merits as far as you're suggesting. It almost seems to me, again, big picture, that what you're doing by what you were, the evidence you were putting out, the expert that you were putting forth, and I guess my question is, at the Rule 23 stage, do we go any further than that? Is it really just a clearly erroneous standard for... Well, if now we're talking about whether or not the market was efficient as opposed to what these plaintiffs did or didn't rely on. On the issue of whether or not the market was efficient, the issue here is that the district court applied the wrong standard. That's your first point? Absolutely. What Judge Davis did was he ignored the requirement that efficiency requires proof, proof that the stock price immediately reacts to and reflects information. What does immediate mean? Well, that's a very good question. Immediate, we believe, means if you look at the literature and you look at the case law, it means sometimes five to ten minutes, at least within one trading day. Well, I think at Merck we didn't say it doesn't have to be simultaneous. It can be shortly thereafter. There are examples in the record where the reaction wasn't until four days later. My guess is if this court asked Mr. Carnuth and I to have an immediate conference and I said I'll get back to you in four days, you'd say that's not immediate. So the Third Circuit standard was articulated. Sometimes the way, as slow as we go sometimes, that may be okay. I may have to use that shit later, Your Honor. But the Third Circuit in Peel said that the fraud in the market theory rests on the assumption that there is a nearly perfect market in information and that the market price reacts to and reflects available information. Well, if you look at what the lower court did, the lower court recognized this and the lower court said that yes, theoretically, in a perfectly efficient market there should be no significant price movement without some identifiable news event. Unfortunately, the court then went on to just simply tally factors and looked at the price reaction to news with respect to DVI and said, well, 59% of the time DVI reacts to news. 41% of the reactions, no identifiable news whatsoever. And the lower court says this suggests a relatively efficient market. Getting back to your question about how deep do you have to delve, well, I believe in hydrogen peroxide there was an issue of whether or not a threshold showing is enough. This court said no, a threshold is not enough. Here, suggests that it's relatively efficient seems to me to be some type of, at most, a threshold showing. And this court said that the requirements of Rule 23 must be met, not just supported by some evidence. Let's look at this, what the court did in finding 59% reaction good enough or suggesting efficiency. No site to any legal authority, cited two studies that didn't analyze market efficiency, didn't perform a cause and effect analysis, didn't, and those studies didn't look efficient. Efficient market is what normally, it's normally a factual determination, is it not? Well, it, it. Was the market efficient with respect to? Ultimately it is. The question here is what was the standard? And, and, and what this judge, what Judge Davis did was he took an amalgam of factors from a variety of district courts and basically just did a tally and said, well, in my view, most of them support efficiency. I thought it was an attempt to apply the so-called camera factors which were adopted by our court in Hayes and then sort of tallied them up. Hayes did not adopt the camera factors, it noted them. But an interesting thing about Hayes and camera itself, it was on a motion to dismiss. Well, I would have thought that Hayes did adopt them, but. Well, it, in any event, Hayes was on a motion to dismiss. And the issue is not whether or not the court should look at these factors, but through what prism, what, what lens should the court look at these factors? It look, should look at the factors through the lens of Peel and Merck, that there should be an immediate price reaction to news, and that the stock price should reflect news. And to say that 59% is nearly perfect, I mean, can you imagine if, if Scott Fransky said, ladies and gentlemen, Roy Halladay has just pitched a nearly perfect game. He got out two out of every three batters he faced. In, in what world is that nearly perfect? So we  But, but the Phillies back in the 50s, that was pretty good. But I, no. Well, again, I mean, if, if my kids were to come home with a 59 on a test, I wouldn't say congratulations, honey, you got a nearly perfect score. You don't, you don't need the immediate standard, though, to prevail in your argument, do you? I mean, it doesn't have to be almost instantaneous. It does not have to be almost instantaneous. We have, we have cited a whole series of, of cases and, and articles which talk about the timing for that. But there has to be some reflection of news in the stock price, and that just didn't happen here. Or it only happened 59% of the time. With respect to loss causation, the court made, and admittedly made no effort to look at loss causation. Because that's not the law of the circuit. Isn't that the reason the court didn't delve into that? Well, I don't believe this circuit has addressed that issue head on. There are two circuits that have, the Fifth Circuit and the Second Circuit. I understand. The Fifth Circuit in Oscar and the Second Circuit in Solomon. And you're asking this court to essentially adopt, as I understand it, the Oscar standard. And if I heard your earlier argument correctly, you want to front load the reliance and the loss causation determination pre-certification. Is that correct? Yes. It makes sense to have loss causation decided at the class certification. And have all the discovery and all the mechanisms necessary to do that at the front end? Isn't that cumbersome? Well, it's interesting Your Honor raises that. Oscar says, quote, there's little discovery that would be demanded for the fraud of the market presumption. Its proof is drawn from public data and public filings. And I think it would be a much better rule to have it decided at the front than to drag defendants through 192 days of deposition. And what this means is that if there's no loss causation, why are we doing that? Why are we dragging parties through that? But then the Second Circuit seems to go on and say you can do some type of limited analysis. I'm not sure what the difference is. In fact, what are you looking for? The Solomon sort of prima facie determination or the full boat Oscar? Oscar. Because? Well, it makes sense. It's the plaintiff's burden. And so the plaintiff should have to come forth and show loss causation. Why doesn't the Solomon analysis satisfy what you want? Well, actually, it really doesn't matter for purposes of this argument because under Solomon what the court said was, well, the law was not clear at the time of certification. Because what Solomon does is shifts it to the defendants. And we contend, as we put in the papers, that in fact we showed that there's evidence that there is not loss causation as to this entire class. But in any event, for purposes of this appeal, it doesn't matter whether you go with Oscar or Solomon in terms of having to have a loss causation analysis because the defendants would get an opportunity on remand to present that evidence because the law, Solomon I believe came out while this Rule 23 was being briefed. Oscar came out while class was being briefed. And I raised it at oral argument in the lower court. You wanted to start off with reliance and I steered you into your seat there. That's fine, Your Honor. Why don't you go ahead with that? And that'll bring you into loss causation again because we have certain presumptions here. And the question is whether this is a, quote, sort of typical securities case. It's not like the Newton case. And I understand you say it's that typical because of the efficiency, market efficiency arguments that you have. But take us through your arguments on reliance and then back to... With respect to the plaintiffs. With respect to the plaintiffs, our argument with respect to reliance goes along these lines. We find that the market for stock and bonds were efficient. Plaintiffs themselves did not rely on the integrity of the market in general in which DVI was trading. Because of insider information? Well, even if it's, we say because of insider information. But in addition to that, what they tout, what they tout is their ability to get information. They say that these markets are informationally inefficient. That's their edge. So as to the markets in general. And they talk about how they look for stocks that are incorrectly priced. And then as to DVI itself, they contacted the CEO, they contacted the CFO. I guess my, a reprise of something I asked previously. Even if you can show that you did not defraud the lead plaintiffs here, you still haven't shown that you, that you didn't defraud the market, which includes the rest of the class. Well, this, what we're talking about is the fraud on the market presumption of reliance. So that what they are doing is the plaintiffs are using that. And the question I'm asking, let's assume that the lead plaintiffs, for whatever reason, are not a good fit. But if there is a presumption of reliance in light of the bank statement, the basic decision of 1988, why can't there still be a fraud on the market in those who are the ordinary folks, ordinary buyers in that market? Well, if, to take the premise of your hypothetical, which is if there were an efficient market here, that just affords the plaintiff, that is a piece of affording the plaintiff a fraud on the market presumption of reliance. We have the opportunity to rebut that. Right. You've hit it. It seems like what you're trying to do is, okay, there's a presumption, but it's a rebuttable presumption. And you're trying to rebut it by saying that the lead plaintiffs here did not rely on this information. But my question is, but what if the rest of the class did, the market did, does that mean it would seem that we can still go forward with a class action? And with the presumption of reliance as to the 99% of the folks, it just happens not to be the lead plaintiffs or some of the lead plaintiffs. But the premise of the fraud on the market presumption is that the plaintiffs relied. And if we've rebutted that- Yeah. And all I'm saying is I'm taking plaintiffs as a big universe, not necessarily to assume your example. But there's no one else before the court. There's only lead plaintiffs before the court. But did everybody, how many people bought the stock and did two tranches of notes? I don't know. We don't know. I think it's off the top of my head. Do we have a guess? No, we don't have a guess. Okay. So again, Your Honors, I implore you to reverse the lower court because using the correct standard, the plaintiffs did not prove that the market for DVI stock and bonds was efficient. Even if you find that the market were efficient, plaintiffs themselves did not rely and the court did not address the evidence of reliance. And then, in addition, the lower court failed to require the plaintiffs to prove loss causation at the class certification stage. Thank you. Thank you very much, Mr. Carmaford. Mr. Karmath? Good afternoon. Mike Karmath on behalf of Respondents, the Cedar Street Funds. I'd like to begin by alleviating any concerns that you may have regarding the lead plaintiffs in this case. Judge Davis went through a rigorous analysis to determine whether or not Deloitte's accusations that lead plaintiffs trade in fundamental value or inefficient markets was credible. The record amply supports that there is absolutely no support for that accusation. In fact, in Deloitte's principle brief, Deloitte states that we recognize that several cases have held that sophisticated institutional investors can still reap the benefits of presumed reliance on the market price even when they claim that such investors routinely do the ability to achieve above market returns. Lead plaintiffs in this case were merely, when they were referring to inefficiencies in the market, were merely... Capitalizing on what they thought were stocks that were inaccurately priced. Yeah, exactly. Well, all investors trade in securities because they believe that the price is either going to go up or down. This was just a marketing sort of statement that was made by the lead plaintiffs. They never said that they trade in informationally inefficient markets. What they are indicating is that they trade in securities, given their experience and hard work, they're trying to figure out which direction will the stock go. That's the premise of any investor's decision to invest in a company. And in this case, there's a full record in this case regarding whether or not there was any insider trading. They made these false accusations about our clients trading on insider information. Judge Davis went through a very, very rigorous analysis of all the public information that showed that information that the lead plaintiffs had was already publicly disclosed or it was immaterial, and there was absolutely no basis for Deloitte's accusation that they traded on insider information. And your point seems to be that if they did, in fact, that it was the worst case of insider trading in history because they lost a million six in the process. Correct. Is that right? Correct. It's illogical to believe that our clients trade on insider information. If they had, they certainly wouldn't have bought the stock. And another point to make is that all markets are at some level inefficient. Economic literature and the courts agree that there is no perfectly efficient market. And so for an investor to say we're trying to capitalize on inefficiencies, it's just stating the obvious, that there are some inefficiencies in markets. And with their hard work and experience, they're going to try to figure out which direction on a perspective basis going forward in the future what that direction is going to take. Let me jump ahead. Understanding that BASIC hasn't been adopted by this circuit, the point seems to be if you combine some elements of BASIC and Solomon that it is burdensome on defendants in class action cases such as this to have to go through torturous and extended discovery and expend potentially millions of dollars in a case that may later be revisited. The certification may later be revisited. And it seemed that those cases were an attempt to front load the loss causation element at all. Let's take Solomon, for example. Why isn't that a better way to allow, for example, some loss causation to be factored in to the court's determination on a Rule 23 certification? That's a softball. Your Honor, this court has already decided that issue in Newton and in Hydrogen. And in both cases has squarely decided that proof of loss causation is not required at the class certification stage. The only requirement is that loss causation is susceptible to class wide treatment. And in this case, as Judge Spica, you acknowledged or indicated, this is a typical securities fraud case. It's a case where there's undisputed fraud from the beginning of the class period to the end. So the entire class period should remain intact. There's undisputed economic loss in this case. They don't dispute that investors lost millions and millions of dollars in this case. Let's come at it from a different point of view. What if we look at the scope of the class and consider the in and out traders? People that sold before May 20th, 2003. District Judge included all of those in the class. Under Dura, it would appear that there is no loss for those individuals. Why should they be in the class? And how does, why shouldn't a district court, either through a determination on the scope of the class, or perhaps on a consideration of loss causation, perhaps under the Second Circuit model, deal with this issue up front? Doesn't it make a difference in terms of a progress or the dynamics of the class action, as to whether your potential class is 10,000 or 10 million or a million? And wouldn't it be a good idea to get this worked out in the beginning insofar as you possibly can? On the issue of the in and out traders, Your Honor, that issue was addressed by Judge Davis in the sense that he did a rigorous analysis of the loss causation requirement. Even though he didn't have to delve into the merits of loss causation, he actually went ahead and did that. In analyzing the party's submissions on the cause and effect factor for market efficiency, both sides submitted event studies which the court correctly found were methodically and evidentiary the same. And event studies essentially plot out the company-specific events and the significant returns in the stock price and show a connection between the two. And in this case, the court looked at those and found that on seven different occasions, DVI's stock dropped significantly, and it did so in connection with the frauds that are alleged in this case. But what about the people that sold their stock before the first disclosure? Well, the record supports that economic losses, which they don't have, dispute. Economic losses occurred throughout the class period and also occurred prior to this May 20th, 2003 date that they allege was the first disclosure, which is not true. Our complaint identifies periods before May 20th, 2003 where there were significant drops. Were there any disclosures before May 20th? Yes, there were disclosures before May 20th that relate to the fraud, and Judge Davis correctly determined that there were significant drops in disclosures on at least seven different occasions and left for the jury to decide if other disclosures prior to May 20th also occurred. And that's a fact-intensive inquiry that gets to whether or not this court should delve into or require district courts to delve into that heavy fact-intensive inquiry of loss causation. Loss causation does not have to be shown in order for fraud in the market theory to apply. There are two different analysis, and to meld the two is inappropriate and inconsistent with this court's hydrogen and Newton decisions. In addition, the event studies in this case show that there were significant drops prior to May 20th of 2003. And another point, this is being rigorously debated before the jury. The district court right now on summary judgment, Judge Davis has a tremendous amount of briefs, Daubert motions, evidentiary showings, and addressing that very issue as well as other issues on loss causation. There's no reason for this court to prejudge that ruling, and especially when the record in this case is supportive. And I just want to make one point about the Second Circuit's Solomon decision. I don't believe that that decision comports at all with Oscar, and there's been at least two district court opinions in the Southern District of New York that say that Solomon rejects Oscar. There's not a front-loading or even a back-loading on the rebuttal side. There's no backdoor opportunity for defendants to rebut the loss causation presumption in Solomon. Solomon was merely remanding to allow plaintiffs in that case to rebut the fraud on the market theory. So that was a limited ruling, and they even said that they're allowing a very limited opportunity for the district court to see whether or not those investors relied on the market. Isn't part of the difference between Oscar and Solomon as to whether you buy into the efficient markets analysis? If you don't, it seems you would go the Oscar way. If you do, you would go the Solomon route. That's correct, Your Honor. Oscar calls into question whether or not the efficient market hypothesis, is a correct hypothesis to follow, and this court in Peel v. Spicer, which adopted the fraud on the market theory, in which Basic heavily relied on, was correct, that it's a theory that operates and works just fine in these types of securities fraud cases and should continue. But Solomon does not allow for a defendant at the class certification stage to challenge loss causation, proving loss causation. Solomon leaves that for the jury or the fact finder to decide. It's a misreading of Solomon to suggest that it allows the defendants to go back and rebut the loss causation presumption. There's no language in that, and actually there's language against that. I'd like to point out on the market efficiency issues that, again, I think Judge Ambrose, you brought up, isn't that issue a fact and sense of issue and subject to clear error, and that is correct. And Deloitte doesn't identify any factual finding that Judge Davis made that was erroneous. He went through every single factor, he went through every argument that Deloitte raised, he went through all the factors that they claimed to be applicable in the case, and found that they weighed in favor of market efficiency. Do you have any quarrel with the factors that were used by Judge Davis? No, we don't, Your Honor. Judge Davis' selection of the factors that he used was appropriate. He used the factors that were identified in Kammer, that this Court adopted in Hayes v. Gross, and he also used other factors that other courts have used in other market efficiency cases. And it was a landslide for plaintiffs in this case. This was a case where seven of eight factors favored market efficiency on the stock, and seven of seven favored market efficiency on the senior notes. It wasn't a close call, and they don't raise any factual determination that was made that was clearly erroneous. And actually, the District Court correctly found that on most, if not all, the evidentiary issues, there was agreement. In this case, all parties did an event study that the Court found were using the same methodologies, using the same underlying evidence, and in the case of the correlation, came out with the same result. In this case, the parties agreed that the correlation between news events and stock price movements was 59%. Now, Deloitte's counsel criticizes that level as not being high enough. That is twice the amount of the average of stocks listed on the S&P 500 index. If this Court were to find that that was insufficient, it would also have to find that over half the, if not all, of the stocks listed on the S&P 500 also traded in an inefficient market. And that's just, it's unreasonable. In addition to the event studies, which were found to be the same by all parties, the Court found that the actual trading volume, there was no disagreement. Now, Deloitte tries to cut it up a little bit and say, well, you shouldn't include this part of the trading volume, but there's no, they don't provide any support for that, they just try to arbitrarily exclude it so that it comes under the 1% camera factor. But even if you do exclude it, it still meets the 1% camera factor, which is supportive of market efficiency. I had suggested to your opposing counsel that it looked as if what the Court did was, they took the camera factors, which I thought Arhay's decision, especially in note one, had adopted, balanced them out, and came out differently from the way he would want them to come out. And it seemed to me as if, or I said, would that not indicate that what you're asking for is us to re-weigh the analysis or the weighing done by the District Court. Is that a fair statement, or was I off base? No, you're exactly right, Your Honor. They're trying to have this Court delve back into the facts in this case and re-weigh the factors that Judge Davis came, and as the First Circuit stated in Accelero.com and Polymedica, that's a determination that should be made by the District Court, and it should be under clear error review, and if the factors that were applied are appropriate, which they are, because this Court has already adopted them on Hayes v. Gross, then there's no reason to re-review those. Now, the point that he's making only is that these lead plaintiffs are different. I mean, if you follow that through, if he's right with respect to others, then might you not be in a Newton situation where you really are saying, what's required here for every plaintiff is an individualized inquiry, a proper class under Rule 23? Should the Court go further than the lead plaintiffs, or do what? What should the Court do to analyze that particular objection? So I'm clear, Your Honor. The objection being that the lead plaintiffs didn't really rely. They had their own way of looking at whether they buy in or do not buy in, and maybe they miscalculated, but they had their own way, and they're not representative of the class, and obviously at some point, if you're not representative of the class and you have to do individual inquiries for everybody, you're under a Newton-type situation where it's not susceptible to being a class, a proper class. Well, again, that's a factual inquiry that Judge Davis delved into rigorously, and you'll see in the record in this case ample support for why these lead plaintiffs are just like every other investor that tries to predict the future price of the market. If you render these investors inadequate, it'll send shockwaves through the market because nobody would be deemed to be adequate. It sounds to me that you really don't have much of a problem with the Solomon decision of the Second Circuit. If we were to join in adopting that approach, it would be fine with you. The Solomon decision is fine in the sense of allowing the court... At the class certification stage. Well, this court hasn't entertained a case where they allow the defendants a second bite at the apple, and that's what they're trying to do here, but they're trying to do so without providing any evidence or any basis for doing so. I understand your position is that the district court conducted the proper analysis here, but as a matter of law, you would not be opposed to our adopting the Solomon formulation. Is that correct? Well, as a matter of law, in terms of if you're referring to Solomon allowing for defendants an opportunity to rebut the fraud of the market theory, yes, that's allowable under Solomon, but Solomon does not require or does not allow the defendants an opportunity to rebut a presumption of loss causation once it's determined that loss causation is capable of class-wide proof. So it's not really a second bite at the apple. You don't want an early bite at the apple, is that correct? Not on the merits of loss causation, because that takes away from the jury and the fact finder the fact-intensive determination of whether or not you can prove loss causation. But to the Chief Judge's question, you don't have a problem if the district court delves in to some aspects, at least, of loss causation as part of its calculus in making the certification, albeit not with the opportunity for the defendants to rebut it pre-certification. Is that correct? No, I do have a concern about delving into any part of the merits of loss causation when you have a typical security fraud case like this. But isn't that what Solomon stands for? No, Solomon stands for only allowing the defendants an opportunity to rebut the fraud of the market presumption of reliance. And actually in Solomon they gave a few examples of what they meant by that. And they said if the defendants can show that plaintiffs would have bought the securities regardless of knowing of the fraud, then that's an example of rebutting the presumption. Or if they knew of the fraud and bought anyway, that's another example. So, or if the... If they sold before any disclosure? If they sold before any disclosure? Well, in this case, Your Honor, the record shows that throughout the class period the stock was inflated. There's a bankruptcy examiner's report and the guilty plea by the CFO of DVI showing that this was a massive fraud. And it's arguable that the entire stock price was inflated. Now, throughout the class period, for most of the class period, the price was stable. But towards the end, from September of 2002 forward, the stock price dramatically dropped. And it dropped on information related to the fraud. And to try to get into the fact-intensive inquiries as to whether or not the drop in the stock price is connected to the prior misstatements is an inquiry that should not be done at the class certification stage. It should wait until later at the summary judgment, which is being litigated vigorously by both sides right now. And Judge Davis has a pile of paper in front of him. But to elaborate on the question that was asked by the Chief Judge, and it's a somewhat absurd example, but bear with me. If you have a situation where you have evidence that everybody's sold in advance of the disclosure, everybody, they're all out. And that's known. Your rejection of Solomon apparently means you go back to sort of pure basic, if you will, and that can't be within the judge's contemplation when he certifies. Well, if the record supports there being absolutely no economic loss prior to a certain date, then I would agree. But doesn't that mean that the court can delve into loss causation to some degree, which is what I think Solomon may stand for? If it goes to the Rule 23 requirements of predominance, then this court in hydrogen, as well as Solomon, would allow for an inquiry into the merits on a preliminary basis. But in terms of that question, that specific question of whether or not people that sold before a certain date, you know, that inquiry is actually one that is a class-wide inquiry. It's going to be decided on a class basis whether or not those people have damages in the case. And in this case, the record doesn't support the claim that prior to May 20th of 2003, that people are unable to prove loss causation. And loss causation is, in some cases, easy to show. In other cases, it's a little bit more difficult, and you need to delve into some of the facts in order for you to prove it. This court has indicated in at least one or two decisions that loss causation can be shown directly or indirectly. And sometimes it is shown indirectly through not only corrective disclosures, but other means. So to cut off somebody's ability to show losses before you have a full record and a full analysis, in this case, they didn't even hire a loss causation expert. They didn't produce any evidence showing that loss causation can't be proven. I think the question is, to what extent can you assume that the market has incorporated bad information if the information isn't known? Doesn't that, in effect, make the rebuttal easier for the other side? Well, in this case... Assuming you even, do you still have a presumption that there's been a negative effect on the market if those people got out before the disclosure? Does it make sense? Well, if you have a fact pattern where people got out before any loss occurred, then it's a Dura situation where, you know, it's an inflated price without any loss, because they bought at an inflated price and they sold at an inflated price. But in this situation, we have a record that clearly shows, it's in the event studies and recognized by Judge Davis, that you have a record where prior to May 20th of 2003, which they pin, they try to pin that date as the date where that was the first disclosure. Well, they don't have any evidence of that, they don't have any expert opinion on that. They just make that claim without any basis for it. And the record clearly shows, and I'll provide this court with a site to the event studies, and that's A1443-52, which is a September 2002 period where there were substantial losses and DVI-specific news that indicated there was problems here. And whether or not there's a connection to those disclosures and the drop and the fraud is an intensely fact issue that should be decided by the trier of fact and not at class certification. Which, in your view, militates against the Oscar way of doing business. Correct. Every court outside the Fifth Circuit has rejected Oscar that has dealt with it. There's more than 20 decisions that have thoroughly analyzed whether Oscar has some merit and they have all rejected it. On a different matter, you're familiar with a Zlotnick case from the circuit? Yes, I am. All right. Is that still good law after Basic v. Levinson? Well, Your Honor, there have been decisions after Zlotnick that have called into question its continuing viability. Zlotnick was decided prior to Basic, and Basic relies on this court's decision in Peel v. Fizer. If Zlotnick has some narrow application, it would be limited to the short term short selling situation where a person presumably would actually want to see a fraud in the company because they're selling short and they're hoping that the price is going to go down. And there's some case law that suggests if the person didn't rely on the market because they would have entered into the transaction knowing of the fraud, then that could be a basis for rebuttal. And in short sellers, you could say would have sold short even if they knew that the price was inflated. But I think the decisions after Zlotnick are in terms of criticizing the holding in the sense that both buyers and sellers should be included and not excluded because they both reasonably rely on market information is the better rule. Good. Any further questions? Thank you, Your Honor. Good. Mr. Comerford. There were some questions about the standard of review with respect to our argument that the court applied the wrong standard. This is on market efficiency. And Mr. Carnuth in discussion with Your Honor discussed whether or not we're asking for a re-weighing. We're not asking for a re-weighing. Our position is that Judge Davis applied the wrong standard. What is the standard he applied? He looked at an amalgam of factors, some of which are presumptions themselves, and therefore relied on presumptions to find a presumption. And he didn't look at them through the lens of Peel and Merck. Your Honor, Judge Jones, you had asked me about the issue of immediate. And there is case law directly on point on that issue as to what immediate is. The Polymedica case, which we cite, talks about same-day trading. That case also, Polymedica, also talks about the only direct evidence of market efficiency or market inefficiency, which is autocorrelation. And again, here, Judge Davis found that there was autocorrelation. And that went in your favor. Yes. And here's the analysis that the district court found. So again, in Polymedica, there was a filing of an S3. There was 31 percent on the volume. There were seven analysts, 193 market makers. And the court said, hold on, there's autocorrelation. Therefore, the market's not efficient. Well, Judge Davis said, yes, DVI had significant autocorrelation. That weighs against the finding of efficiency. Nevertheless, we conclude that DVI is traded in an efficient market. Nevertheless, in our view, is not rigorous analysis. There's, again, no tying to the standard in this court. Does autocorrelation, is that a trumping factor? Well, Polymedica, it was a trumping factor. Should it be in our jurisprudence? In an efficient market, past price returns shouldn't have predictive power over the future. And if they do, then the stock is not trading in an efficient market. And that's unrebutted. Our evidence on that was unrebutted. Their expert just said he couldn't conclude. We did put an expert testimony, and the judge found that there was autocorrelation with respect to DVI stock. And I had mentioned that the judge used presumptions to find presumptions. But then he flips with respect to the bonds. So on the stock, he says, well, it trades on the New York Stock Exchange, so I find that favors. But then on the bonds, he says, it's a transparent market, but I'm going to discount that. There was like a 99.2% correlation on the bonds? On the bonds, it was a transparent market because there were no consistent prices. There were different prices between the New York Stock Exchange and the OTC bonds. But in addition- How different was the pricing? I don't know that off the top of my head, Your Honor. In addition, with respect to the volume on the stock, he says, well, 1%, I'm going to find there's a presumption here. But when we look at the bonds, 48% of the days, there's no trading at all. And again, he discounts that. So if this Court is going to say it's okay to apply presumptions, there was clear error here. They weren't applied correctly by Judge Davis. With respect to Zlotnick, Judge Stricker, that you mentioned, Basic cited Zlotnick, and cited for the proposition that reliance is presumed only where it's logical. Well, here, it is not logical. Mr. Carnuth mentioned that his clients didn't trade in informationally inefficient markets. But we presented evidence, and it's in the record, that they did exactly that, that they traded in markets where information is not efficiently disseminated. It's not logical to presume reliance in this situation. And with respect to loss causation, I believe Mr. Carnuth mentioned both the hydrogen case and the Newton case in saying that loss causation is not required at class certification. Well, with respect to the hydrogen case first, in hydrogen, the defendant sought to rebut whether its conduct had an anti-competitive impact. And so the Court had to actually decide if such impact existed. Here, we presented evidence that they're in-and-out traders. In fact, Your Honor has pointed out that those in-and-out traders wouldn't be able to prove loss causation. And it's interesting, actually, this May 20 date goes out there. If you look at the briefing, the date may actually be August 13th, based on what the plaintiffs say and, in fact, what Judge Davis says. But in any event, if that date's used, one of the main plaintiffs is an in-and-out trader with respect to loss causation. And in the Newton case, I know, Judge Stricker, you're the author of the Newton case, but Newton did not involve fraud in the market or loss causation. The issue there, I do not believe the Court reached the issue of loss causation because there was no evidence of loss in Newton. So I don't think it's fair to say that this Court has addressed the issue of whether loss causation is required at class and rejected it. When were the – in your view, when were the first disclosures that might have impacted the market? Well, with respect to my client, and this is – Ms. Carnuth is correct that this is teed up for summary judgment. With respect to my client, we do not believe there are any corrective disclosures. But according to the plaintiff, the first corrective disclosure, if you look at footnote 13 of Judge Davis's opinion, talks about, I believe, August 13th, in which, right, in footnote 13, the full scope of DVI's financial troubles weren't revealed until after the final purchase. At no time prior to August 13, the bankruptcy announcement, did DVI publicly identify any misrepresentations or accounting improprieties. But with respect to what the date ultimately is for the purposes of this appeal, I believe the issue is, should Judge Davis have delved into loss causation? He completely punted on the issue and said it's too fact intensive, he's not going to look at it. He didn't find that there's loss causation as to people before May 20 or August 13. He didn't find – make any findings with respect to loss causation. And our position, as I mentioned in my primary argument, is that loss causation should be decided and addressed at the loss – I'm sorry, at the class certification stage. Mr. Comerford, thank you very much. We'd like a transcript made of the argument and ask that you share that. And if you would please check in with the clerk's office before you leave, they'll tell you how to do that. Share the cause? Yes. Thank you, Your Honor. Thank you very much.